UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRANDY L. BOND,

        Plaintiff,

                                  Case No. 20-cv-910-pp

    v.

JENNIFER NICHOLS and "CNA NIKKI,"

        Defendants.

---

**ORDER GRANTING PLAINTIFF'S MOTION FOR ADDITIONAL EVIDENCE (DKT. NO. 38), DENYING PLAINTIFF'S MOTION TO APPOINT COUNSEL (DKT. NO. 44), DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE AMENDED COMPLAINT (DKT. NO. 45), GRANTING DEFENDANT NICHOLS' MOTION FOR SUMMARY JUDGMENT (DKT. NO. 28) AND ORDERING PLAINTIFF TO SHOW CAUSE WHY THE COURT SHOULD NOT DISMISS "CNA NIKKI" AND THE CASE**

---

In June of 2020, the plaintiff—representing herself—filed a complaint alleging that several individuals (including "Nina Bond") violated her rights by colluding to have her committed to a mental health facility and then forcibly drugging her. Dkt. No. 1. At screening, the court dismissed all defendants except Jennifer Nichols and "A CNA known as Nikki," both of whom the plaintiff alleged to have been Milwaukee County Behavioral Health Division employees at the time of the events described in the complaint. Dkt. No. 6 at 8.

"CNA Nikki" never has been identified or served, but on December 5, 2022, defendant Jennifer Nichols filed a motion for summary judgment. Dkt. No. 28. On December 19, 2022, the plaintiff filed a response brief, dkt. no. 39, and a "motion for additional evidence[,]" dkt. no. 38. On January 4, 2023,

1

Nichols filed a reply brief in support of her motion for summary judgment. Dkt. No. 41. On July 17, 2023, the plaintiff filed a motion asking the court to appoint counsel. Dkt. No. 44. On January 5, 2024—approximately nineteen months after the deadline had expired for the parties to amend their pleadings[1] and approximately one year after the defendant's motion for summary judgement was fully briefed—the plaintiff filed a motion for leave to file an amended complaint. Dkt. No. 45.

The court will grant the plaintiff's motion for additional evidence, dkt. no. 38, but will deny her motion to appoint counsel, dkt. no 44, and her motion for leave to file an amended complaint, dkt. no. 45. The court will grant defendant Nichols's motion for summary judgment, dkt. no. 28, and dismiss the plaintiff's claims against her. The court will give the plaintiff a deadline by which to provide sufficient information to allow the U.S. Marshals Service to serve "CNA Nikki"; otherwise, the court will dismiss her and the case.

I.    **Procedural Background**

The plaintiff's June 16, 2020 complaint[2] alleged that Nina Bond, Milwaukee County Behavioral Health, Jennifer Nichols and Tina Yegger had violated her "first amendment right of speech," her "15th amendment right which covers [her] pursuit of happiness," her "right to protest unlawful

_____

[1] The April 26, 2022 scheduling order required that "[p]arties wishing to amend pleadings or join parties without leave of the court shall do so no later than the end of the day on June 15, 2022." Dkt. No. 17.

[2] The complaint the plaintiff filed on June 16, 2020 (after hours) was not signed. Dkt. No. 1. On July 6, 2020—three weeks later—the clerk's office received a signed, dated signature page. Dkt. No. 1-1.

government actions," her "right to refuse harmful drugs" and her "religious freedoms." Dkt. No. 1 at 3. Although one of the named defendants—Nina Bond—has the same surname as the plaintiff, the complaint did not say whether Nina Bond was related to the plaintiff and, if so, how.[3]

The complaint alleged that on April 24, 2020, Nina Bond and "other city and county officials" colluded to have the plaintiff committed to "Milwaukee counties behavioral Health, after not being in contact with [her] for over a year and not seeing [her] in person for over three years." Id. The plaintiff asserted that after a fifteen-minute interaction with Nina Bond—whom, the plaintiff says, was in the middle of the street, crying—Bond called the Milwaukee police. Id. The plaintiff said that Nina Bond had stated to the plaintiff and others that the plaintiff was "evil" and that Nina Bond had hated the plaintiff since the plaintiff was six years old; the plaintiff asserted that one time Nina Bond "pursued" the plaintiff with Nina Bond's brother Houston Bond, punching the plaintiff in the stomach and "turning [her] into mental health as a child." Id. The plaintiff alleged that Nina Bond made a false accusation that the plaintiff constituted a harm to herself or others and obstructed the plaintiff's right "to

---

[3] In a letter the plaintiff filed with the court after it issued its screening order, the plaintiff asserted that "Nina Bond has previously been an [sic] security guard and investigative asset for Milwaukee county although, I don't currently have proof that she is still employed in that position under the Milwaukee county executives office." Dkt. No. 8. In other pleadings, the plaintiff implies that Nina Bond is her mother; in one, she stated that Nina Bond had abandoned the plaintiff when the plaintiff was seven years old. Dkt. No. 21 at 3-4.

3

use memory resurfacing techniques in order to recall memories blocked out of [the plaintiff's] childhood due to abuse." Id.

The plaintiff claimed that while she was in Milwaukee County Behavioral Health against her will, a CNA (certified nursing assistant) known only as "Nikki" bound her arms and ankles to a bed for refusing to take drugs. Id. The plaintiff also alleged that "CNA Nikki" and other Milwaukee County Behavioral Health Division employees verbally abused her throughout her stay; she asserted that the abuse was constant, overwhelming and permanently damaging. Id. She alleged that CNA Nikki told her, "You're ugly and you need your hair done." Id.

The plaintiff claimed that "[u]pon becoming an inpatient at Milwaukee County behavioral Health for three weeks," for two of those weeks she was in a "comatose state due to being drugged up by needles by the Milwaukee County behavioral Health Staff." Id. She asserted that she was "forced to sign a six month commitment under distress without seeing a judge or consulting my attorney in order to be released." Id.

Regarding the defendant, the plaintiff stated:

Following my release Milwaukee county employee whom also made the decision to make me an inpatient and forced drugs on me on April 24th beg[a]n to call my house and threaten that I will be thrown back into Milwaukee County behavioral Health inpatient care if I did not take drugs that were causing harm to my body. And also weren't available to me due to insurance purposes. This behavior caused me to have multiple anxiety attacks.

Id. at 4.

4

The plaintiff alleged that Milwaukee "mental associates and their employee Tina Yegger" violated her religious freedom by forcing her to see a psychiatrist and to take psychotropic drugs. Id.

The plaintiff concluded the complaint:

> It is my intent to prove that the law is not being demonstrated in a generally applicable fashion while current looters and protesters are not being subject to the same cruel and unusual punishment that I was subject to in protest of the stay at home order and general unconstitutional practices that are negatively affecting my quality-of-life being demonstrated by Nina Bond, Jennifer Nichols, CNA for Milwaukee county only known as Nikki and Tina Yegger. I see immediate relief to their unconstitutional actions along with $250,000 in compensation for defamation of character, physical and emotional abuse, violation of civil rights, pain and suffering and violation of religious freedoms and other constitutional rights.

Id.

The court screened the complaint, granted the plaintiff's request to proceed without prepaying the filing fee and allowed the plaintiff to proceed against only Nichols and "CNA Nikki" under 42 U.S.C. §1983, because it appeared that both had been employees of the county. Dkt. No. 6 at 7. The court recognized "that neither the Supreme Court nor the Seventh Circuit has decided whether civilly committed individuals have a constitutional right to refuse psychotropic drugs." Id. at 6. But the court adopted the same analysis as Judge Peterson of the Western District had applied in Kreger-Mueller v. Doe, Case No. 18-cv-708, 2019 WL 4256832, at *4 (W.D. Wis. Sept. 9, 2019), concluding that a civilly committed patient could proceed with her forced medication claim under the due process clause of the Fourteenth Amendment. Id. The court allowed the plaintiff to proceed against "CNA Nikki" under §1983

5

on a claim that "CNA Nikki" violated her liberty interest in avoiding the unwanted administration of drugs.[4] Id. at 6. The court allowed the plaintiff to proceed against Nichols on the plaintiff's claims that Nichols was one of the staff members that forced drugs on her on April 24, 2020, and that Nichols visited the plaintiff at home and threatened to return her to inpatient status if the plaintiff did not take her medications. Id. at 7.

Nichols answered the complaint on April 1, 2022. Dkt. No. 13. On April 20, 2022, the plaintiff filed a motion to amend the complaint and a request for the court to appoint counsel. Dkt. No. 15. Five days later, the parties—in response to the court's directive—filed their joint Rule 26(f) plan. Dkt. No. 16. The court issued a scheduling order the next day. Dkt. No. 17.

On June 14, 2022—the day before the deadline for amending pleadings— the plaintiff filed a document that she called an "updated claim." Dkt. No. 18. Nichols filed a motion to strike that document, dkt. no. 19, which the court granted, dkt. no. 25. The plaintiff also objected to providing her medical records in discovery, dkt. no. 20, and filed a motion to strike "from the record any claims made, by Dr. Noah Jeanette," dkt. no. 21. The second motion also asked the court to "order Milwaukee County to enter settlement agreements."

---

[4] In the plaintiff's response to the defendant's motion for summary judgement, the plaintiff accuses the defendant of negligently disregarding the plaintiff's complaints about safety and being overmedicated. Dkt. No. 39 at 4, 8-9, 12-13. The complaint did not allege negligence. Dkt. No. 1. Because the plaintiff did not bring a claim of negligence in her complaint, the court will not analyze that claim in the context of Nichols' motion for summary judgment.

6

Dkt. No. 21 at 1. And the plaintiff filed a motion for requests for admission.
Dkt. No. 23. The court denied these motions. Dkt. No. 25.

On December 5, 2022, Nichols filed her motion for summary judgment,
dkt. no. 28, a brief in support, dkt. no. 29, proposed findings of material fact,
dkt. no. 30, her own declaration, dkt. no. 31, and the declaration of Tony W.
Thrasher, DO, DFAPA, dkt. no. 32.

Meanwhile, "CNA Nikki"—the other defendant against whom the court
had allowed the plaintiff to proceed—had not answered. On December 5, 2022,
the plaintiff filed a request for entry of default against CNA Nikki, dkt. no. 34,
and a motion for default judgment against her, dkt. no. 34, along with the
plaintiff's declaration, dkt. no. 36.

A couple of weeks later, the plaintiff filed a "motion for additional
evidence," dkt. no. 38, a document titled "Response to Jennifer Nichols,
Summary Judgment," dkt. no. 39, exhibits, dkt. no. 39-1, and her own
declaration, dkt. no. 40. Nichols filed a reply brief in support of her motion for
summary judgment, dkt. no. 41, and the plaintiff filed "objections" to that
document, dkt. no. 42.

The court denied the plaintiff's motion for entry of default and motion for
default judgment against CNA Nikki. Dkt. No. 43. But the court did not
expeditiously address Nichols' pending summary judgment motion. Some six
months after the summary judgment motion was fully briefed, the plaintiff filed
a second motion asking the court to appoint counsel. Dkt. No. 44. Six months

7

after that, the plaintiff filed a motion for leave to file an amended complaint. Dkt. No. 45.

## II.     Motion for Additional Evidence (Dkt. No. 38)

The plaintiff filed her "motion for additional evidence[,]" dk. no 38, the same day she filed her "Response to Jennifer Nichols, Summary Judgment," dkt. no. 39, and accompanying declaration, dkt. no. 40. The entire motion consists of a single sentence: "Motion to add additional evidence to summary judgment package beyond 30 pages." Dkt. No. 38 at 1. The second page of the motion is a list of eight items, which the plaintiff references as "Additional evidence labeled 1-8 bottom right." Id. at 2. Attached to the motion are thirty-nine pages of documents, including information about driving violations, an accident report, information about patients' rights, probate records and medical records. Dkt. No. 38-1.

The court suspects that the plaintiff filed this motion because she misunderstood Civil Local Rule 56 (E.D. Wis.). That rule says that "[a] principal memorandum in support of, or opposition to, summary judgment must not exceed 30 pages . . . (excluding any caption, cover page, table of contents, table of authorities, and signature block)." Civil L. R. 56(b)(8)(A). Rule 56(b)(8)(B) prohibits a person from filing a memorandum that exceeds the page limitations in 56(b)(8)(A) unless the court gives that person permission to file an oversized memorandum.

The thirty-page limit applies to a "principal memorandum in support of, or opposition to" a summary judgment motion. The thirty-page limit does *not*

8

apply to exhibits or evidence that a party might file in support of, or in opposition to, the motion. It appears that the plaintiff interpreted the rule as imposing a thirty-page limit on *all* documents filed in opposition to summary judgment. If one combines all the documents the plaintiff filed—her fourteen-page "Response to Jennifer Nichols, Summary Judgment," the twelve pages of exhibits she attached to that "Response" and the plaintiff's three-page declaration—one finds that she had filed twenty-nine pages of documents. Apparently believing that filing additional exhibits would put her over the thirty-page limit, the plaintiff asked for permission to file an additional thirty-nine pages of exhibits.

The plaintiff's motion was not necessary. As the defendant points out in her reply brief, not only did the plaintiff *not* exceed the thirty-page limit applicable to a "principal memorandum," but she doesn't seem to have filed a "principal memorandum" in opposition to Nichols' summary judgment motion at all. See Nichols' Reply Brief at Dkt. No. 41, pages 2-3. The fourteen page "Response to Jennifer Nichols, Summary Judgment," dkt. no. 39, as the court explains later in this decision, is not a "principal memorandum"—a legal brief. It is a kind of combined response to some of Nichols' proposed findings of material fact/argument/complaint. Even if the "Response to Jennifer Nichols, Summary Judgment" constitutes a "principal memorandum," that document was only fourteen pages long. More to the point, the documents the plaintiff asked to add were exhibits/evidence, not brief pages, and again, the rule does

not limit how much *evidence* the plaintiff can file in opposition to Nichols' motion.

As the court noted, the plaintiff filed this (unnecessary) motion the same day that she filed the "Response to Jennifer Nichols, Summary Judgment," attached exhibits and her declaration. That means that Nichols received the thirty-nine additional pages the same time she received the plaintiff's other materials in opposition to summary judgment. Nichols' reply brief shows that she considered the "additional evidence" (she has argued that it does not relate to her). Dkt. No. 41 at 3. Although the plaintiff's motion was unnecessary, the court will grant it because doing so does not prejudice Nichols.

## III. Motion to Appoint Counsel (Dkt. No. 44)

### A. Background

On April 20, 2022, the plaintiff filed her first motion for the court to appoint her a lawyer. Dkt. No. 15. The plaintiff said only that she was "filing a motion to request a court appointed attorney, seeing that it is the current defendants stance that [she is] mentally ill[;] [a]lthough [she] refute[s] that claim." Id.

On November 7, 2022, the court denied that motion. Dkt. No. 25. The court explained:

> The court will deny the plaintiff's motion to appoint counsel. The plaintiff has presented no evidence that she has tried to find a lawyer on her own. Even if she had, the plaintiff has not demonstrated that at this stage, it is beyond her capabilities to represent herself. She asserts that the defendants believe that she is mentally ill, but she denies that she is mentally ill. She has filed several pleadings, all of which are articulate. While the court may not always be able to follow the chronology of the events she

10

describes, or make out who the plaintiff believes committed the acts she describes, her pleadings are not incomprehensible. She was able to confer with opposing counsel to prepare the Rule 26(f) plan and it also appears that she has engaged in some discovery.

Id. at 13. The court denied the motion without prejudice and informed the plaintiff that "[i]f there comes a time when the litigation becomes too complex or difficult for the plaintiff to handle on her own, she may renew her motion." Id.

On July 17, 2023—six months after Nichols' summary judgement motion was fully briefed—the plaintiff filed a second motion asking the court to appoint counsel. Dkt. No. 44. In the second motion, the plaintiff states that, "[d]espite [her] earnest efforts, [she has] encountered significant difficulties in securing legal representation." Id. at 1. The plaintiff claims that she has "diligently reached out to over 50 attorneys in an attempt to retain legal counsel for [her] case." Id. She says, "[r]egrettably, each one of them has declined [her] request, citing that they do not specialize in the specific area of law required for my case." Id.

The plaintiff attached to the motion two communications with law firms as "example[s] of the responses [she has] received." Id. The first communication appears to be from Civitas Law Group Inc., which informed the plaintiff that they "only take family law cases." Dkt. No. 44-1 at 1. Civitas suggested the plaintiff contact the Milwaukee Bar Association's Lawyer Referral Service and gave the plaintiff the referral service's phone number. Id. The second communication appears to be an inquiry the plaintiff sent to La Fleur Law Office, but the plaintiff did not provide the court with the firm's response. Id. at

11

2. In her motion, the plaintiff stated that, "[i]f necessary, [she] can provide a more comprehensive list of attorneys who have declined [her] request." Dkt. No. 44 at 1-2.

B.    Legal Standard

"[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" Henderson v. Ghosh, 755 F.3d 559, 564 (7th Cir. 2014) (quoting Olson v. Morgan, 750 F.3d 708, 711 (7th Cir. 2014)). In federal civil litigation, a litigant has "no right to recruitment of counsel." Dewitt v. Corizon, Inc., 760 F.3d 654, 657 (7th Cir. 2014). However, the court has discretion to recruit a lawyer for individuals who cannot afford to hire one. Navejar v. Iyola, 718 F.3d 692, 696 (7th Cir. 2013); 28 U.S.C. §1915(e)(1). In exercising its discretion, the court must make the following inquiries: "(1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it [herself]?" Pruitt v. Mote, 503 F.3d 647, 654 (7th Cir. 2007).

To satisfy the first prong, the court must determine that a plaintiff made a good faith effort to hire counsel. Pickett v. Chi. Transit Authority, 930 F.3d 869, 871 (7th Cir. 2019). "This is a mandatory, threshold inquiry that must be determined before moving to the second inquiry." Eagan v. Dempsey, 987 F.3d 667, 682 (7th Cir. 2021) "The court usually requires a petitioner to show that

he has contacted at least three lawyers to establish that he made a reasonable attempt to hire counsel on his own." Devroy v. Boughton, Case No. 22-cv-727-pp, 2023 WL 4059112, at *4 (E.D. Wis. June 19, 2023). The court also "typically requires [a plaintiff to] submit[] letters from several attorneys declining assistance and copies any documents that show Plaintiff tried to find an attorney." Astramsky v. Geisler, Case No. 23-2146, 2023 WL 7300534, at *2 (C.D. Ill. Nov. 6, 2023) (citing Olson, 750 F.3d at 711).

If a litigant satisfies the first inquiry, the court then must determine "whether the difficulty of the case—factually and legally—exceeds the plaintiff's capacity as a lay person to coherently present it." Pruitt, 507 F.3d at 654-55. "The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims." Eagan, 987 F.3d at 682. When considering the second prong, the court "must examine the difficulty of litigating specific claims and the plaintiff's individual competence to litigate those claims without counsel." Pennewell v. Parish, 923 F.3d 486, 490 (7th Cir. 2019). "The question is not whether the *pro se* litigant would be as effective as a lawyer, but rather whether the difficulty of the case, factually, legally, and practically, exceeds the litigant's capacity as a layperson to coherently litigate the case." Id. This includes "all tasks that normally attend litigation," such as "evidence gathering, preparing and responding to court filings and motions, navigating discovery, and putting on a trial." Id. at 491. The court "must consider the plaintiff's literacy, communication skills, education level, litigation experience, intellectual

13

capacity, psychological history, physical limitations, and any other characteristics that may limit the plaintiff's ability to litigate the case." Id.

Given the scarcity of *pro bono* counsel resources, the court also may consider the merits of a plaintiff's claim and what is at stake. Watts v. Kidman, 42 F.4th 755, 764-65 (7th Cir. 2022). "[E]ven where a litigant's claim is nonfrivolous and factually and legally plausible such that it survives §1915(e)(2) screening, the recruitment of counsel is unwarranted if the plaintiff's chances of success are extremely slim." Id. at 766 (quotation omitted). "[T]he preliminary assessment of likely merit must be under-taken somewhat more generously since the unrepresented litigant might have difficulty articulating the circumstances that will indicate the merit that might be developed by competent counsel." Watts v. Kidman, 42 F.4th 755, 766 (7th Cir. 2022) (quotation omitted).

C.    Analysis

For the purposes of this motion, the court will accept the plaintiff's assertion that she has "diligently reached out to over 50 attorneys" but that "each one of them has declined [her] request, citing that they do not specialize in the specific area of law required for [her] case." Id. at 1. The court will conclude that the plaintiff has satisfied the first requirement of trying to find an attorney on her own.

But the plaintiff has not satisfied the second requirement—she has not demonstrated that her case is so complex that she cannot litigate it on her own. The plaintiff filed this second motion requesting appointment of counsel

14

six months after Nichols's summary judgment motion was fully briefed (likely because the court has taken much longer to address the summary judgment motion than it should have). In its order denying the plaintiff's initial motion to appoint counsel, the court recounted that at that time, the plaintiff "ha[d] filed several [articulate] pleadings," "was able to confer with opposing counsel to prepare the Rule 26(f) plan" and "ha[d] engaged in some discovery." Dkt. No. 25 at 11-13. Since then, the plaintiff has filed additional documents. Dkt. Nos. 35-36, 38-40, 42, 44. She has filed a detailed "Response to Jennifer Nichols, Summary Judgment" that includes facts the plaintiff disputes. Dkt. No. 39. She has filed evidence in opposition to Nichols's motion, a declaration and (although not allowed under the rules) objections to Nichols's reply brief. The plaintiff has continued to show that she can articulate her arguments to the court.

As a result of the court's extreme delay in addressing the summary judgment motion, there is nothing for a lawyer to do at this point. Perhaps the plaintiff filed the motion *because* the court has delayed so long, and the plaintiff thought that if she had a lawyer, the case would move more quickly. Or perhaps she thought a lawyer could explain to her what more needed to be done to cause the court to make a decision. But the delay in resolving this case isn't because the plaintiff doesn't have a lawyer—it is because of the court's caseload and schedule. The court finally is addressing the pending motions, and, as it will explain below, has concluded that Nichols is entitled to summary judgment and that CNA Nikki must either be served or dismissed. The court

15

would have come to the same conclusion if the plaintiff had been represented by a lawyer. The court will deny the plaintiff's motion to appoint counsel.

## IV. Motion for Leave to File an Amended Complaint (Dkt. No. 45)

### A. Background

In April 2022, the plaintiff filed a motion for leave to file an amended complaint. Dkt. No. 15. The plaintiff stated that she "would like to file a motion to amend the complaint so it may be written to reflect recent dismissals." Id. at 1. The plaintiff said that "[o]ne year has passed since filing this complaint and new evidence has risen as well as new damages[,]" and that she "would like to request permission to add new defendants." Id. The plaintiff did not attach to that motion a proposed amended complaint, nor did she explain the nature of the "new evidence[,]" "new damages" or "new defendants." Id.

Five days later, the parties filed their Rule 26(f) plan, dkt. no. 16; the court issued the scheduling order the following day, setting a deadline of June 15, 2022 for amending pleadings, dkt. no. 17. On June 14, 2022—the day before the deadline for amending pleadings—the plaintiff filed a document titled "Updated claim." Dkt. No. 18. The court had not yet ruled on her April 2022 motion for leave to amend. Dkt. No. 15.

The "updated claim" was not prepared on the court's complaint form. It recounted events starting on or around April 17, 2020—prior to the date the plaintiff had alleged that she was forcibly medicated and about two months before the plaintiff had filed her federal lawsuit. Dkt. No. 18 at 1. It asserted that on or around April 17, 2020, "while recovering memories of abuse, identity

16

theft, and stolen wealth," the plaintiff was accosted. Id. She stated that she had

spoke to her "mother" (a word the plaintiff put in quotes) Nina Bond about

missing finances and her "Aunt" (again, the plaintiff's quotes) Melissa Nelson

regarding "illegal sexual activity with minors; when [the plaintiff] was a child."

Id. The plaintiff said that on April 17, 2020 she'd been "arrested" and taken to

Milwaukee County Behavioral Health complex and that she'd not been released

until May 24, 2020. Id. She said she'd been unconscious for seven to eight

days and that she had "yet to recover a manuscript of the court case because

[she] was unconscious and it never happened." Id. The plaintiff alleged that she

was "again assaulted" by Nichols and an unknown nurse with a puncture

wound of an unknown substance which caused [the plaintiff] to have a seizure

and going to a comma [sic] for over 21 days." Id. The plaintiff asserted that she

was not a danger to herself or others and that under state law she couldn't be

given drugs without a diagnosis. Id. at 1-2. She claimed that Nichols

"repeatedly" came to her home to force her to take drugs. Id. at 2. The plaintiff

asserted that Nichols's actions "cost [the plaintiff] an estimate of $1 million in

lost revenue" through real estate actions, stolen money and fraudulent actors

trying to steal her settlements and inheritance while she was chained to a bed

in Milwaukee County Behavioral Health. Id. The plaintiff made additional

accusations against "CNA Nikki." Id. She alleged that she was sexually

molested, offered "cast for prostitution" while in the complex and that a CNA

named Mike offered her Taco Bell food for sex. Id. The four-page motion

contained several other allegations. At the end, the plaintiff said that she'd

17

identified "[f]urther negligent actors," and listed Milwaukee County Executive David Crowley, two unnamed police officers, Melissa Nelson, "[v]arious Milwaukee can see mental health agencies," the state of Wisconsin and the CNA "only known as Mike." Id. at 4. The document was not signed or verified.

Nichols moved to strike the "updated claim." Dkt. No. 19. She argued that it did not meet the requirements of Federal Rules of Civil Procedure 10(b) and 8(d), Civil L.R. 10(a) and 15(a). Id. at 1. Nichols argued that the "updated claim" did not contain a short and plain statement of the claim, as required by Fed. R. Civ. P. 8(a), that it did not contain numbered paragraphs and that it did not allege separate claims or counts. Id. at 2-3. She argued that the "updated claim" made allegations against defendants that the court had dismissed in the screening order; more to the point, Nichols argued that one could not determine from the "updated claim" what rights the plaintiff alleged had been violated and by whom. Id. at 3.

On November 7, 2022, the court issued an order addressing the plaintiff's motion to amend (Dkt. No. 15), and Nichols' motion to strike (Dkt. No. 19). Dkt. No. 25. Regarding the motion for leave to amend, the court explained that as of the date the plaintiff had filed the motion, the defendant had answered only nineteen days earlier; because Fed. R. Civ. P. 15(a)(1) allows a party to amend without leave of court within twenty-one days of service of a responsive pleading, the plaintiff simply could have filed a proposed amended complaint and did not have to ask the court's permission. Id. at 5. The court denied the motion as unnecessary. Id. The court also concluded that the

18

plaintiff's "updated claim" likely was intended to be an amended complaint and that it was timely filed. Id. at 5-6.

Regarding Nichols' motion to strike the "updated claim," the court concluded that the "updated claim" did not constitute an amended complaint (even if the plaintiff had intended it to be). Id. at 9. The court found that the "updated claim" did not comply with Civil L.R. 15(a), which requires a party to reproduce the entire pleading, including the allegations from the original complaint. Id. The court said it could not tell from the "updated claim" who the plaintiff believed had violated her rights and how. Id. The court also concluded that the "updated claim" inappropriately raised new issues that did not arise from the same transaction or occurrence as the claims in the original complaint. Id. at 9-10. The court granted the defendant's motion to strike the "updated claim." Id. at 11.

On January 5, 2024—about a year after the defendant's motion for summary judgement was fully briefed—the plaintiff filed a "Motion to file a Amended claim." Dkt. No. 45. In this two-page motion, the plaintiff says that she wants to "substantiate [her] claims of unconstitutional treatment and detainment at the Milwaukee County Behavioral Health facility in Wauwatosa, Wisconsin." Id. at 1. The plaintiff explains that "[t]he harm inflicted on [her] cognitive abilities hindered [her] ability to articulate [her] allegations coherently to the court." Id. She says that "[t]he delay in this updated claim was due to [her] inability to engage legal representation, compounded by the severe impact on [her] cognitive functions beyond [her] control." Id.

The plaintiff attached to the motion an amended complaint, which reiterates the claims in her original complaint but with some additional details. Dkt. No. 45-1. The proposed amended pleading names as defendants "Milwaukee County Behavioral Health & Employee's Jennifer Nichols and Nikki 'CNA' Nikki." Id. at 1. The document gives some background information about the plaintiff's educational history. Id. at 1. In the process of reiterating her claims about what happened on April 17, 2020, the plaintiff adds that when she got to Milwaukee County Behavioral Health, she was "not examined by a doctor due to the COVID-19 shut down." Id. at 3. The main difference between the original complaint and the proposed amended complaint, however, is the addition of allegations against "Dr. Jeanette Noah,"[5] whom the plaintiff had mentioned in an earlier motion and whom the proposed amended complaint alleges had treated the plaintiff and had "requested a court order from the Milwaukee county court for forced medication, which was declined." Id. at 3. (The plaintiff did not name Dr. Noah as a defendant in the original complaint, nor did she mention Dr. Noah in the "updated claim.") The proposed amended complaint alleges that while under Dr. Noah's care, the plaintiff had been given "over 23 different psychotropic medication's, [sic] and placed in a medically induced coma." Id. at 4. It alleges that the plaintiff had COVID-19 symptoms at the time. Id. The proposed amended complaint asserts that Dr. Noah released the plaintiff and "forc[ed]" her "under duress" to sign a voluntary six-month

---

[5] In an earlier pleading, the plaintiff referred to this person as "Dr. Noah Jeannette," and used "he/him" pronouns when discussing this person. Dkt. No. 21.

commitment despite the plaintiff's disagreement. Id. The proposed amended complaint says that the plaintiff was "accused" of delusions of grandeur for saying that she had run for public office and that she had a home, but it does not identify who made these accusations. Id. at 5. It says that Dr. Noah "accused" the plaintiff of "psychotic delusions" for "explaining that the person who called the Milwaukee police department to have [the plaintiff] taken to Milwaukee county behavioral health was actually previously involved in an accident that resulted in loss of life, in Milwaukee county."[6] Id. Despite making allegations against Dr. Noah, neither the caption of the proposed amended complaint nor the space for listing the citizenship of defendants list Dr. Noah as a defendant.

The proposed amended complaint also makes further claims against Nichols, asserting that the plaintiff told Nichols that the plaintiff did not want to be part of "the voluntary program," that Nichols called the plaintiff's home and threatened to have her returned to Milwaukee County Behavioral Health if the plaintiff did not take psychotropic medications and that Nichols violated the plaintiff's privacy by talking about "the missed diagnosed mental illness with several Milwaukee county behavioral health contractors." Id. at 5-6.

The remainder of the proposed amended complaint discusses things that have happened to the plaintiff without identifying any perpetrators, discusses

---

[6] (This appears to be a reference to Nina Bond; in a "motion to strike" the plaintiff previously had filed, the plaintiff alleged that "Dr. Noah Jeanette" had failed to conduct due diligence to investigate the plaintiff's claims that Nina Bond had driven recklessly and murdered a woman. Dkt. No. 21 at 1.

the plaintiff's view of the law and explains the impact the events have had on the plaintiff. Id. at 6-7.

Nichols did not respond to the plaintiff's motion.

B.    Legal Standard

Ordinarily, the court evaluates a motion for leave to amend a complaint under Fed. R. Civ. P. 15(a)(2), which states that courts "should freely give leave when justice so requires." Under Rule 15(a)(2), the court has "broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to the defendants, or where the amendment would be futile." Arreola v. Godinez, 546 F.3d 788, 796 (7th Cir. 2008). "Prejudice to the nonmoving party caused by undue delay is a particularly important consideration when assessing a motion under Rule 15(a)(2)." Allen v. Brown Advisory, LLC, 41 F.4th 843, 853 (7th Cir. 2022).

When a plaintiff moves to amend her complaint after the deadline for amending the pleadings has expired (and, in this case, after a defendant's summary judgment motion has been fully briefed), she is, in effect, asking to modify the schedule the court set in its scheduling order. Rule 16(b)(4) says that a party seeking to modify a schedule must show good cause and obtain the consent of the judge. The central consideration in assessing whether good cause exists is the diligence of the party seeking to amend. Alioto v. Town of Lisbon, 651 F.3d 715, 720 (7th Cir. 2011)).

C.    <u>Analysis</u>

The plaintiff filed her motion for leave to file an amended complaint approximately nineteen months after the expiration of the June 15, 2022 deadline for the parties to amend their pleadings. On the one hand, the court suspects that the plaintiff wants to amend her pleadings because she believes that the reason the court has taken so long to decide Nichols' summary judgment motion is because the court doesn't understand the plaintiff's claims, or because the plaintiff has failed to take some required action. To the extent that the court's extreme delay in ruling on Nichols' motion has misled the plaintiff to think that she needs to do something, or that the court's delay is her fault, the court assures the plaintiff that the fault is entirely the court's. The court has not been waiting for the plaintiff to file something else or do something more. The court simply has been tied up with other cases and other obligations.

That said, the plaintiff's motion does not say that she only recently found out about the information and allegations she wants to add to the complaint. The plaintiff could have made all the allegations contained in the January 2024 proposed amended complaint in her June 2022 "updated claim." She also could have asked the court to extend the June 2022 deadline for amending pleadings to allow her to try again to amend the complaint after the court struck her "updated claim." The plaintiff did not do either of these things. She waited over a year and a half to seek to amend the complaint, so she must

23

meet the heightened, good-cause standard of Rule 16(b)(4) and the requirements of Rule 15(a)(2). She has not done so.

The nineteen-month delay in seeking to amend shows that the plaintiff did not act "diligently." See Allen, 41 F.4th at 853 ("Generally speaking, it is reasonable to conclude that a plaintiff is not diligent when [s]he in silence watches a deadline pass even though [s]he has good reason to act or seek an extension of the deadline."). The plaintiff contends that "[t]he delay in this updated claim was due to [her] inability to engage legal representation, compounded by the severe impact on [her] cognitive functions beyond [her] control." Dkt. No. 45 at 1. But this does not state good cause for the delay; without representation and despite the "severe impact" on her "cognitive functions," the plaintiff was able to file substantial opposition materials to Nichols' motion for summary judgment. In its November 2022 order striking the plaintiff's "updated claim," the court explained the proper procedure for filing an amended complaint. DKt. No. 25. That means the plaintiff knew, for almost fourteen months before she filed this most recent motion for leave to amend, how to properly prepare an amended complaint. The plaintiff did not act diligently in waiting more than a year after receiving these instructions to file her second motion to amend. And the plaintiff does not explain the "severe impact" on her "cognitive functions" that was "beyond her control."

Allowing the plaintiff to amend her complaint this late in the litigation would cause undue prejudice to Nichols. See Allen, 41 F.4th at 853. Nichols's summary judgment briefs and supporting evidence address the claims in the

24

original complaint. Dkt. Nos. 29-32, 41. If the court were to grant the plaintiff's motion to amend, Nichols would be required to answer the amended complaint and to file new summary judgment motion to address the modified claims against her. This is true even though many of the claims in the proposed amended complaint have nothing to do with Nichols, particularly the claims against Dr. Noah.

It would be futile to allow the plaintiff to amend her complaint. As it relates to Nichols, the amended complaint largely reiterates the allegations in the original complaint. The few details the plaintiff seeks to add against Nichols would not change the court's ruling on summary judgment, as it will explain below. The allegations against others do not impact the court's summary judgment ruling as to Nichols.

Finally, the court has mentioned that in the caption of the proposed amended complaint, the plaintiff named Milwaukee County Behavioral Health as a defendant. To the extent that the plaintiff is trying to join "Milwaukee County Behavioral Health" as defendant, she cannot do so. In its screening order the court terminated "Milwaukee County Behavioral Health Division" as a defendant, explaining that "Milwaukee County Behavioral Health Division . . . is not a legal entity separable from the county government that it serves and is therefore not a proper defendant." Dkt. No. 6 at 7. See Walker v. Clarke, Case No. 20-CV-542, 2020 WL 2520794, *2 (E.D. Wis. May 18, 2020) ("Because the Milwaukee County Behavioral Health Division is a division of the Department of Health and Human Services, which is a department of

Milwaukee County, the Behavioral Health Division is not a proper defendant in this case."); see also Whiting v. Marathon Cnty. Sheriff's Dep't, 382 F.3d 700, 704 (7th Cir. 2004).

The court will deny the plaintiff's motion for leave to file an amended complaint.

## V. Motion for Summary Judgment (Dkt. No. 28)

Nichols argues that the court should grant summary judgment in her favor on three grounds: (1) the plaintiff cannot meet her burden under §1983 because the evidence shows that Nichols was not personally involved in administering psychotropic drugs or other medications to the plaintiff while the plaintiff was an inpatient at the Behavioral Health Division; (2) in her capacity as the plaintiff's crisis care coordinator following the plaintiff's discharge from the Behavioral Health Division, Nichols' words and actions do not give rise to a constitutional violation under any potential theory of law; and (3) Nichols is entitled to qualified immunity. Dkt. No. 29 at 3-4.

### A. Facts

This court's local rules require a party opposing a motion for summary judgment to file a memorandum of law, a concise response to the moving party's proposed statement of material facts and any evidentiary documents that support the opposing party's facts (or dispute the moving party's facts). A "memorandum of law" is a legal brief, in which a party cites the statutes and legal decisions governing her case and explains why the undisputed facts entitle her to judgment under that law. The nonmoving party's response to the

26

moving party's proposed statement of material facts must contain "a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph" and "a statement, consisting of short numbered paragraphs, of any additional facts that require the denial of summary judgment." Civil L. R. 56(b)(2)(B). "The Court will deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment." Civil L. R. 56(b)(4).

For the most part, Nichols complied with these requirements. She filed a fourteen-page memorandum of law in support of her motion for summary judgment, citing cases that she argued entitled her to relief. As required by Civil L.R. 56(b)(1)(C), Nichols filed a statement of proposed material facts as to which she asserted there was no genuine issue. Dkt. No. 30. As required by Civil L.R. 56(b)(1)(C)(i), Nichols's statement of proposed material facts consists of short, numbered paragraphs, but it does *not* comply with Rule 56(b)(1)(C)(i)'s requirement that each numbered paragraph contain only a single material fact. It does, however, comply with the rule's requirement that it cite to specific record evidence that proves each fact.

The plaintiff did not file a document titled "memorandum of law." She did not file a document titled "response to Nichols's proposed findings of material fact." She did not file a document titled "plaintiff's proposed material facts." As noted earlier, the plaintiff filed a fourteen-page document titled "Response to Jennifer Nichols, Summary Judgment." Dkt. No. 39. This document has elements of each of the items required by Civil L.R. 56(b)(2), but it doesn't

27

constitute any one of those items. The document is not a "memorandum of law," although it does cite several Wisconsin statutes, the Code of Federal Regulations and two cases—one from the United States Supreme Court and one from a Florida state court of appeals. The local rule regarding proposed statements of material facts requires a party opposing a motion for summary judgment to file "a reproduction of each numbered paragraph in the moving party's statement of facts followed by a response to each paragraph, including, in the case of any disagreement, specific references to the affidavits, declarations, parts of the record, and other supporting materials relief upon." Civil L.R. 56(b)(2)(B)(i) The document the plaintiff filed *does* contain numbered paragraphs, each of which starts with the word "Dispute." But the plaintiff did not reproduce *each* numbered paragraph in Nichols's proposed statement of material facts, followed by an explanation of whether she disputed each one. Some of the plaintiff's numbered paragraphs simply assert—without referencing the source of the fact she disputes—the plaintiff's version of the facts. Several of the numbered paragraphs dispute particular lines from Nichols's *declaration* (Dkt. No. 31). Some of the numbered paragraphs make legal claims (such as that Nichols violated the plaintiff's "civil right to end voluntary treatment," dkt. no. 39 at ¶6). Other numbered paragraphs contain only argument. As best the court can tell, only *one* of the plaintiff's numbered paragraphs responds to one of Nichols's proposed findings of material fact—the plaintiff's paragraph 8 appears to be a response to Nichols's proposed finding of material fact #10. Dkt. No. 39 at ¶8.

28

The document the plaintiff filed appears to be a combination opposition to Nichols's proposed statement of material facts/statement of the plaintiff's proposed material facts/statement of argument/attempt to amend the complaint. Because it is not in the format required by the local rule, it is sometimes difficult to determine which of Nichols's proposed statements of fact the plaintiff is disputing. And there is no way to determine whether the plaintiff agrees with (or at least does not dispute) those facts to which she did not respond at all.

Civil L.R. 56(b)(9) states that "[f]ailure to comply with the requirements in this rule may result in sanctions up to and including the Court denying or granting the motion." Although the plaintiff's opposition materials do not comply with Rule 56(b), neither do Nichols's. The court will rule on the merits of Nichols's motion and will not grant or deny the motion solely as a sanction for non-compliance by either party. But "[t]he Court will deem uncontroverted statements of material fact admitted solely for the purpose of deciding summary judgment." Civil L. R. 56(b)(4); see also Smith, 321 F.3d at 683 ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."). The court has done its best, where it can, to recount any of the plaintiff's disputes that are supported by citations to evidence.

1.    *The Plaintiff's Inpatient Treatment*

In April 2020, if a person was detained by law enforcement under Wis. Stat. §51.15[7], that person was detained under an "Emergency Detention" and brought to the Psychiatric Crisis Services, a "free-standing psychiatric emergency room" staffed and run by Milwaukee County until the fall of 2022. Dkt. Nos. 30 at ¶2; 32 at ¶5 (declaration of Tony W. Thrasher, doctor of osteopathy and physician at Milwaukee County Behavioral Health Division)[8]. On April 23, 2020, the Milwaukee Police Department detained the plaintiff under an Emergency Detention and transported her to Psychiatric Crisis Services. Dkt. Nos. 32 at ¶6, 32-2 at 3 (excerpts of medical records), 40 at 1 (the plaintiff's declaration). (The plaintiff asserts that she was placed on a "PLS not initiated by the Milwaukee police department but by Nina Bond and Melissa Nelson," dkt. no. 39 at ¶18, citing a Statement of Emergency Detention by Law Enforcement Officer by Officer Damon Wilcox referring to the plaintiff's emergency detention on April 23, 2020 and listing the witnesses as Nina Bond

---

[7] Wis. Stat. §51.15 explains that its purpose is "to provide, on an emergency basis, treatment by the least restrictive means appropriate to the individual's needs, to individuals who meet all of the following criteria: (1) Are mentally ill, drug dependent, or developmentally disabled;" (2) evidence a substantial probability of physical harm, impairment or injury to themselves or others; and (3) "are reasonably believed to be unable or unwilling to cooperate with voluntary treatment." Wis. Stat. §51.15(1). Once a law enforcement officer delivers the individual to a treatment facility, the facility's director must determine if the individual should be detained, evaluated, diagnosed and treated. Wis. Stat. §51.15(4)(b). The filing of an emergency detention statement has the same effect as a petition for commitment under Wis. Stat. §51.20. Id.

[8] Thrasher did not interview the plaintiff and was not involved with the events alleged in the complaint. Dkt. No. 32 at ¶2. He reviewed the plaintiff's certified medical records. Id.

and Melissa Nicholson, dkt. no. 39-1 at 12.) The Emergency Detention statement explained that the officers had brought the plaintiff to Psychiatric Crisis Services after the plaintiff's mother observed her driving in a "very reckless manner." Dkt. No. 32-2 at 4. The statement reflected that Nina Bond told the officer that after exiting her vehicle, the plaintiff "ran in the street in an attempt to get hit by traffic" and that she "kept yelling people were trying to kill her." Id.

Once at the Psychiatric Crisis Services, the plaintiff was served with a Treatment Director's Supplement to Law Enforcement Officer's Statement of Detention and read her legal rights. Dkt. Nos. 32 at ¶9, 32-1 at 3, 32-2 at 1-2, 5. Nichols avers, and the evidence she provided confirms, that upon arriving at Psychiatric Crisis Services, the plaintiff was evaluated by a psychiatrist. Dkt. Nos. 32 at ¶9, 32-1 at 1-4. (Without citing any record evidence, the plaintiff disputes this, saying that it was explained to her that "no doctors were on site due to the COVID-19 pandemic." Dkt. No. 39 at ¶17.) The psychiatrist found that the plaintiff was a danger to herself or others, with a diagnosis of mood disorder and cannabis abuse. Dkt. Nos. 30 at ¶9, 32-1 at 1. The plaintiff was prescribed oral medication, which she refused. Dkt. Nos. 32 at ¶9, 32-1 at 3-4. According to medical notes, the plaintiff was "yelling" and "agitated." Dkt. No. 32-1 at 3. The physician determined that the plaintiff needed to be treated, to have her housing confirmed, to have a legal hold in place and to get case-management services. Dkt. Nos. 32 at ¶10. The plaintiff was admitted. Dkt. No. 32-1 at 3.

After being assessed, the plaintiff was transferred to an acute inpatient unit at the Behavioral Health Division. Dkt. Nos. 32 at ¶11. The following day (April 24, 2020), Hardy Douglas, PhD, determined that the plaintiff needed to "have her mental illness treated, housing confirmed, legal hold in place, and case-management services." Dkt. No. 32-1 at 11. Douglas also determined that the Behavioral Health Division should "[s]eek finding of probable cause, consider need for stipulation vs commitment." Id. Progress notes during the plaintiff's stay at the Behavioral Health Division reflect that on some occasions she refused the medication prescribed for her and on other occasions she took the medication. Dkt. Nos. 32 at ¶13, 32-1 at 15. The plaintiff disputes that Hardy conducted a psychiatric evaluation, asserting that she was unconscious on that date. Dkt. No. 39 at ¶8. She provides no evidence in support of this assertion, implying that staff deliberately left out of the records the fact that she was in a "drug induced coma."

    2. *The Plaintiff's Transfer from Inpatient to Outpatient Treatment*

On May 21, 2020, the Behavioral Health Division staff discharged the plaintiff from inpatient treatment to her home and "the BHS crisis care coordination services program." Dkt. Nos. 32 at ¶14, 32-1 at 5-9. The plaintiff was diagnosed with schizoaffective disorder (manic type), alcohol use disorder and cannabis use disorder. Dkt. Nos. 32 at ¶14, 32-1 at 8. The plaintiff was prescribed various medications and given directions for their usage. Dkt. Nos. 32 at ¶14, 32-1 at 6-7. The plaintiff's discharge summary (prepared by discharging doctor, Donna Luchetta) states that the plaintiff was discharged

"under commitment with conditional leave." Dkt. Nos. 32 at ¶12, 32-1 at 5. The plaintiff disputes this, insisting that there was no commitment order; she cites an affidavit of service for the Milwaukee County probate court executed by Noah Jeannette, attesting that Jeannette had served a "Petition for Medication Order" to the plaintiff on April 28, 2020.[9] Dkt. No. 39-1.

Nichols provided the court with an "Agreement for Conditional Transfer to Outpatient Status Report Pursuant to Sec. 51.35(1) WI Stats."[10] Dkt. No. 32-1 at 16-17. The agreement bears the plaintiff's signature. Id. at 17. The agreement stated:

> [I]t is agreed between the patient and the [Milwaukee County Combined Community Services Board] that said patient shall be transferred from inpatient status at the Milwaukee County Behavioral Health Division . . . to outpatient status, conditioned upon the acceptance by the patient of [a list of] terms and conditions of release.

Id. at 16. Those terms and conditions included that the "[p]atient will take all prescribed medications as directed and comply with any requested lab work."

---

[9] The plaintiff's exhibits show that on April 28, 2020, Judge Paul Van Grunsven of the Milwaukee County Circuit Court found probable cause to support the plaintiff's commitment, appointed examiners under Wis. Stat. §51.20(9) and set a final hearing for May 8, 2020. Dkt. No. 39-1 at 3.

[10] Under Wis. Stat. §51.35(1), the Behavioral Health Division may transfer a patient in their care from a treatment facility into the community if the transfer is consistent with reasonable medical and clinical judgment. "Terms and conditions that will benefit the patient or resident may be imposed as part of a transfer to a less restrictive treatment alternative." Wis. Stat. §51.35(1). A patient who is committed to the Behavioral Health Division "may be required to take medications and receive treatment . . . as a term or condition of a transfer." Id. At the time of the transfer, the patient must be informed of the potential consequences of violating the terms and conditions of the transfer, which may include a return to inpatient treatment. Id.

33

Id. The agreement stated that "[t]he patient acknowledges that any violation of the above conditions of release may result in transfer back to an inpatient facility." Id.

The plaintiff asserts that this agreement was not a court order. Dkt. No. 39 at ¶8. She also appears to allege that she signed the agreement under duress and that it was invalid. Id. at ¶¶8, 22.

3.     *The Plaintiff's Outpatient Treatment*

Upon her discharge, the Behavioral Health Division referred the plaintiff to Nichols, who would serve as the plaintiff's crisis care coordinator. Dkt. Nos. 30 at ¶24, 31 at ¶8 (Nichols' verified declaration), 32 at ¶7, 32-1 at 7. Nichols acted as the plaintiff's crisis care coordinator from May 22 through approximately July 8, 2020, when the plaintiff transitioned to Community Support Program services. Dkt. No. 31 at ¶11. Nichols says that in her capacity as crisis care coordinator, she was "aware that [the plaintiff] was under a Chapter 51 involuntary commitment order for a period of six months through November 8, 2020." Id. at ¶12. The plaintiff again argues that there was no commitment order. Dkt. No. 39 at ¶12. She also argues that Nichols did not give her a copy of the commitment order. Id.

As a crisis care coordinator, Nichols "provided bridge care to clients leaving inpatient care as they transitioned back to the community and to long-term care with a community support program (CSP), targeted case management (TCM), or comprehensive community services (CCS)." Dkt. No. 30 at ¶25. Her duties and responsibilities included "helping clients with

34

medication prescriptions from the pharmacy, offering medication reminder tools, connecting clients with their doctors, reminding them of doctor appointments, communicating with the new treatment team and other community support services for the client, and providing other recommendations until the client was admitted to CSP, TCM or CCS programs for long-term care." Id. at ¶26. Nichols avers that she had no authority or power to prescribe medication to a client and never did so. Id. at ¶27.

Prior to May 21, 2020, Nichols had no interactions or communications with the plaintiff. Id. at ¶9. Nichols was not involved in any way with the plaintiff's inpatient admission to the Behavioral Health Division or her inpatient care. Id. at ¶10. Nichols avers that she was aware that the plaintiff "was required to cooperate with the conditions of release as set forth in the Agreement for Conditional Transfer to Outpatient Status Report including taking medications as prescribed by her doctors." Dkt. No. 31 at ¶13. She avers, however, that she never forced the plaintiff to take any medication. Id. at ¶14. The plaintiff asserts that "Dr. Jeannette Noah" told her that any drugs she took were "voluntary," that Nichols was "fully aware of this fact, because I {plaintiff} told her" and that Nichols nonetheless violated her right to end voluntary treatment. Dkt. No. 39 at ¶¶3, 15. She cites no evidence in support of these assertions.

Nichols avers that on May 22, 2020, she made initial contact with the plaintiff by telephone. Dkt. Nos. 31 at ¶15, 31-1 at 6. The plaintiff told Nichols

35

that she was going to pick up her medication from Walgreens. Id. Nichols asked to meet with the plaintiff in her home the following week. Id.

On May 26, 2020, Nichols went to the plaintiff's home for the scheduled visit, but the plaintiff was not there. Dkt. Nos. 31 at ¶16, 31-1 at 5. Nichols also was unable to reach the plaintiff by phone. Id.

Nichols avers that on May 28, 2020, she spoke with the plaintiff by phone. Dkt. Nos. 31 at ¶17, 31-1 at 5. During the call, the plaintiff accused Nichols of stalking her at home and overmedicating her. Id. The plaintiff said she did not pick up her medications from Walgreens. Id. Nichols offered to pick them up, but the plaintiff refused. Id. The plaintiff told Nichols to "never come to her house again." Id. Nichols reminded the plaintiff that she was required to cooperate with outpatient treatment which included taking her prescribed medication for her mental illness. Id. Nichols encouraged the plaintiff to contact a client rights specialist to discuss her concerns and gave her the contact information. Id. The plaintiff asserts that Nichols "negligently dismissed" the plaintiff's claim that she was being over-medicated. Dkt. No. 39 at ¶4.

On June 4, 2020, Nichols contacted the plaintiff to let her know that the plaintiff would start with Community Support Program services on June 11, 2020. Dkt. Nos. 31 at ¶18, 31-1 at 4. Nichols was unable to reach the plaintiff and left a voicemail message. Id. Nichols also contacted Walgreens and was informed that the plaintiff's prescriptions had been there since May 22 but had not been picked up. Id.

Nichols avers that on June 8, 2020, she attempted a home visit with the plaintiff, accompanied by another member of the crisis care coordination team. Dkt. Nos. 31 at ¶19, 31-1 at 4. When they arrived, another person at the plaintiff's home said that the plaintiff had gone to the grocery store and was not there. Id. Nichols and the other team member waited but when the plaintiff did not return after ten minutes, Nichols left her business card with her contact information. Id. The plaintiff alleges that this means that Nichols discussed her private information with "an individual not privileged to my{ plaintiff's} private information" in violation of HIPAA. Dkt. No. 39 at ¶5.

On June 8, 2020, the plaintiff left Nichols a voice mail message, stating, among other things, that she did not want Nichols to come to her home, that she did not think her medications were covered by state insurance and that she had checked with the pharmacy several times. Dkt. Nos. 31 at ¶20, 31-1 at 4.

Nichols avers that on June 9, 2020, she called the plaintiff. Dkt. Nos. 31 at ¶21, 31-1 at 3. The plaintiff told Nichols that she had just spoken to "Keith" to file an appeal against Nichols and the Behavioral Health Division for arresting the plaintiff and having her "on trial while being on medication." Id. When Nichols reminded the plaintiff of her psychiatric appointment scheduled for June 10, 2020, the plaintiff said that she had canceled the appointment and did not need to attend prior to speaking to a judge about her appeal. Id. Nichols informed the plaintiff that she would start Community Support Program services that week and that someone might contact the plaintiff about

37

this. Id. The plaintiff declined Nichols's offer to help her with renewing her insurance. Id. Nichols avers that the plaintiff had a difficult time staying on topic throughout the conversation, and that Nicols had to redirect the plaintiff several times. Id. The plaintiff stated that Nichols had the plaintiff in "shackles" during her inpatient stay at the Behavioral Health Division to build Nichols's "quota" and that Nichols was using her power and white privilege to have power over the plaintiff. Id. Nichols assured the plaintiff that she wanted to be an advocate for the plaintiff and improve her mental health and well-being. Id. The plaintiff views this as Nichols's acknowledgement that the plaintiff had filed an appeal and reiterates that she'd been told taking medication and participating in aftercare services was voluntary (without citing any record evidence). Dkt. No. 39 at ¶7.

Nichols had no further contact with the plaintiff. Dkt. Nos. 31 at ¶22, 31-1 at 2-3. Nichols did, however, communicate with the plaintiff's new treatment team at CSP to assist with the plaintiff's transition to CSP, which was completed on July 8, 2020. Id.

B.    Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute

over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)); see also Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) ("A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed fact. And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material.") (internal quotations and citations omitted)). "[T]o survive summary judgment, the non-

39

moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in her favor." <u>Fitzgerald</u>, 707 F.3d at 730 (quoting <u>Makowski v. SmithAmundsen LLC</u>, 662 F.3d 818, 822 (7th Cir. 2011)).

      C.   <u>Analysis</u>

In its screening order, the court explained the plaintiff had alleged that Nichols was "a county employee who visited the plaintiff at home and threatened to return the plaintiff to inpatient status if the plaintiff did not take her medications." Dkt. No. 6 at 7. The court said, "While that alone may not give rise to a constitutional violation, the plaintiff adds that Nichols was one of the staff members that forced drugs on her on April 24, 2020." <u>Id.</u> It concluded, "The court will allow the plaintiff to proceed against defendants CNA Nikki and Jennifer Nichols, both of whom appear to be county employees." <u>Id.</u> The court's order was not a model of clarity, but one can reasonably infer from the order that the court allowed the plaintiff to proceed on claims that Nichols violated her constitutional rights by forcibly drugging her on April 24, 2020 and by visiting the plaintiff's home and threatening to return her to inpatient status if she did not take her medications.

Section 1983 of Title 42 is the federal statute through which a plaintiff may bring a claim that a state actor—an employee of a state, county or local government—violated her constitutional rights. To prevail on a §1983 claim, the plaintiff must prove by competent evidence that (1) she was deprived of a right secured by the Constitution or laws of the United States and (2) the

40

person who deprived her of that right was acting under color of state law.

Buchanan-Moore v. County of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009) (citation omitted). Under §1983, "a public employee's liability is premised on her own knowledge and actions, and therefore requires evidence that each defendant, through her own actions, violated the Constitution." Aguilar v. Gaston-Camara, 861 F.3d 626, 630 (7th Cir. 2017) (citing Burks v. Raemisch, 555 F.3d 592, 594 (7th Cir. 2009)). "[T]o be liable under § 1983, the individual defendant must have caused or participated in a constitutional deprivation." Pepper v. Village of Oak Park, 430 F.3d 805, 810 (7th Cir. 2005) (quotation omitted). Without evidence of personal involvement, a defendant cannot be liable under §1983. Walker v. Wexford Health Sources, Inc., 940 F.3d 954, 966 (7th Cir. 2019).

1.    *Nichols's Role in the Plaintiff's Inpatient Treatment*

For the plaintiff to prevail on her claim that Nichols violated her constitutional rights by forcibly medicating her, she needed to provide some evidence that Nichols "caused or participated in" the plaintiff's alleged forced medication at the Behavioral Health Division. See Pepper, 430 F.3d at 810. The plaintiff has not identified any such evidence. Nichols has averred, and the plaintiff has not disputed, that Nichols had no interaction with the plaintiff until May 21, 2020. Nichols is a counselor; at the time of the events the plaintiff described in the complaint, Nichols assisted patients *leaving* inpatient care. The plaintiff has alleged that she was forcibly medicated at the Behavioral Health Division on April 24, 2020, *during* her inpatient stay and almost a

41

month before she had any interaction with Nichols. There is no genuine dispute that Nichols was not involved in the plaintiff's inpatient treatment. The plaintiff has failed to support her allegation that the defendant "made the decision to make [her] an inpatient and forced drugs on [her] on April 24th." Dkt. No. 1 at 4.[11]

Nichols is entitled to summary judgment on this claim.

2.     *Nichols's Role in the Plaintiff's Outpatient Treatment*

Nor has the plaintiff created a genuine dispute regarding whether Nichols "forced drugs on" the plaintiff after the plaintiff was discharged to outpatient treatment. It is undisputed that Nichols did not have the authority or power to prescribe medication to any patient, and never did so. Dkt. No. 31 at ¶6. Nichols avers that she never forced the plaintiff to take any medication. Id. at ¶14. The plaintiff avers that even though she told Nichols that "there was no court order" requiring her to take psychotropic medication, Nichols called her home "on multiple occasions, threatening to have [the plaintiff] readmitted to" the Behavioral Health Division. Dkt. No. 40 at ¶7.

Whether or not there was a court order requiring the plaintiff to take psychotropic drugs, the record shows that the plaintiff *agreed* to take medications, and expressed her understanding that if she didn't, she could be

---

[11] Because there is no genuine dispute as to whether Nichols was involved in any "forcible medication" of the plaintiff, the court need not determine whether a civilly-detained or committed person has a right to refuse medication. As the court noted in the screening order and notes later in this decision, however, neither the Supreme Court nor the Seventh Circuit have, to date, recognized such a right.

42

returned to inpatient care. Dkt. No. 39 at 12. The plaintiff argues that she signed this agreement under duress, but identifies no evidence to support that assertion. The plaintiff insists that she was told by Dr. Noah Jeannette that drugs were "voluntary." She provides no evidence to support this assertion, but she may well be right. Perhaps Dr. Jeannette told the plaintiff that it was her choice whether to sign the agreement, and that it was her choice whether to take medication or risk being returned to inpatient treatment.

Either way, the problem is that the plaintiff equates Nichols's reminders and encouragements—as the plaintiff sees it, nagging and coercion—with "force." The record does not support that leap. The record shows that while acting as the plaintiff's crisis care coordinator, Nichols tried to facilitate the plaintiff getting her prescriptions and reminded the plaintiff that under the agreement the plaintiff had agreed to do certain things like take medication and go to appointments. Dkt. Nos. 31 at 2-4, 31-1 at 5. The plaintiff characterizes these interactions as the defendant "threaten[ing] to have the plaintiff readmitted to Milwaukee County, behavioral health, if [the plaintiff] did not take prescribed medications with no court order." Dkt. No. 39 at 12. But this characterization ignores the fact that the *agreement* provided that the plaintiff could be transferred back to inpatient status if she did not take her medications. The fact that Nichols pointed out that consequence does not mean that Nichols "forced" the plaintiff to do anything. In fact, it appears that the plaintiff *did not* follow Nichols's suggestions. The plaintiff has failed to prove

43

that Nichols violated her constitutional rights by threatening to return her to inpatient status if she did not take her medications.

Even if Nichols *had* told the plaintiff that if she did not take the medications, she could be transferred back to the Behavioral Health Division, that would not have been a violation of the plaintiff's constitutional rights. The court pointed out in its screening order that neither the Supreme Court nor the Seventh Circuit Court of Appeals has decided whether civilly committed persons have a constitutional right to refuse psychotropic drugs. See Kreger-Mueller v. Doe, Case No. 18-cv-708, 2019 WL 4256832, at *4 (W.D. Wis. Sept. 9, 2019) (citing Disability Rights New Jersey, Inc. v. Comm'r, New Jersey Dep't of Hum. Servs., 796 F.3d 293, 296 (3d Cir. 2015) (discussing the Supreme Court litigation on the issue)). If it is not clear that a civilly committed person has a constitutional right to refuse psychotropic drugs, there is no identified constitutional protection against a state actor advising someone who has agreed to take mental health medication that failing to do so could violate that agreement and result in a return to inpatient care.

The plaintiff also tries to raise in her summary judgment opposition a claim that she did not raise in the complaint. Nichols avers that on one occasion, she came to visit the plaintiff but the plaintiff was not home, so Nichols spoke to someone else in the house. The plaintiff avers that Nichols "spoke to [her] tenant, . . . identifying herself as a crisis counselor for Milwaukee county, behavioral health without [the plaintiff's] permission, giving [the tenant] a business card and her phone number." Dkt. No. 40 at ¶8. The

44

plaintiff believes that this violated her rights under HIPPA. Even if Nichols did commit a HIPPA violation—and the court is not finding that she did—that has nothing to do with whether Nichols violated the plaintiff's constitutional rights, and the plaintiff cannot defeat a summary judgment motion by alleging causes of action she did not raise in her complaint.

Nichols is entitled to summary judgment on this claim.

### 3.    *Qualified Immunity*

Qualified immunity protects government officials from damages liability unless they "violate clearly established statutory or constitutional rights." Fosnight v. Jones, 41 F.4th 916, 924 (7th Cir. 2022). While qualified immunity is an affirmative defense, once a defendant raises it, the burden shifts to the plaintiff to defeat it. Purvis v. Oest, 614 F.3d 713, 717 (7th Cir. 2010). To defeat a defense of qualified immunity, the plaintiff must satisfy two elements: first, she must demonstrate that the facts show "a violation of a constitutional right," and second, she must demonstrate that the "constitutional right was clearly established at the time of the alleged violation." Gill v. City of Milwaukee, 850 F.3d 335, 340 (7th Cir. 2017). The court need not address both elements of qualified immunity if one is dispositive and may choose which element to address first. Leiser v. Kloth, 933 F.3d 696, 701 (7th Cir. 2019).

The court need not decide whether Nichols is entitled to qualified immunity, because it has concluded that she is entitled to judgment on the merits of the plaintiff's claims. That said, the plaintiff has not shown that Nichols violated her constitutional rights or that there was, at the time of the

45

alleged violation, a clearly established constitutional right for a civilly committed person[12] not to be forcibly medicated, or for a person released from civil commitment not to be reminded of her agreement to take her medication.

The court will grant the defendant's motion for summary judgment.

## VI. **"CNA Nikki"**

Because the court is granting summary judgment in favor of Nichols, the only defendant remaining in the lawsuit is "CNA Nikki," who was not served with the complaint. The court will give the plaintiff a final chance to obtain and provide sufficient information to allow "CNA Nikki" to be served.

### A. Background

On December 6, 2021, the court ordered the United States Marshals Service to serve a copy of the screening order and the complaint on Nichols and the "CNA known as Nikki." Dkt. No. 6 at 8. On February 7, 2022—almost two months later—the Marshals Service filed a Process Receipt and Return. Dkt. No. 11. This form—completed by the Marshals Service—stated that the Marshals Service received the service packet on December 9, 2021. Id. That same day—December 9, 2021—the Marshals Service emailed the service packet to "CNA known as Nikki's" employer; in the field for "other information that will assist in expediting service, the Marshals Service stated that "CNA known as

---

[12] The plaintiff repeatedly asserts that she was not "committed" to the Behavioral Health Division because there was no court-issued commitment order. But the plaintiff did not challenge the validity of the method by which she was admitted to the Behavioral Health Division in her complaint, and the record evidence indicates that she was at the Behavioral Health Division "under commitment."

Nikki" had "[w]orked at the Milwaukee County Behavioral Health Division on or about April 24, 2020." Id. The Process Receipt and Return reflects that on February 7, 2022, the waiver of service was returned to the clerk's office unexecuted, "unable to locate, more information needed." Id. The docket does not indicate whether the Marshals Service sent a copy of this form to the plaintiff. At that time, the court did not order the plaintiff to provide additional information identifying "CNA Nikki," or advise the plaintiff that if she did not provide additional information by a date certain, the court could dismiss "CNA Nikki" as a defendant.

On August 11, 2022, the plaintiff filed a motion to strike "any claims made, by Dr. Noah Jeanette." Dkt. No. 21 at 1. In that motion, she stated, "Fact: CNA Nikki's noncompliance does not relieve her of responsibility and she has already defaulted." Id. at 2.

On December 5, 2022, the plaintiff filed a motion for entry of default against "CNA Nikki," dkt. no. 34, and a motion for default judgment against "CNA Nikki," dkt. no. 35. In the motion for default judgment, the plaintiff stated that "Milwaukee County is fully aware of the identity and contact information for CNA Nikki, and has refused on multiple occasions to divulge this information to" the plaintiff. Dkt. No. 35. She asserted that "[t]he resources of the US Marshals department has full capabilities to identify and locate this individual," and argue that "CNA Nikki's, then employer, Milwaukee county is fully aware of the claim." Id. She concluded by stating, "It has been stated by Judge Pamela Pepper, that the United States Marshal's office completed due

47

diligence on summoning defendant CNA Nikki. Providing no proof to myself, Brandy Bond plaintiff." Id. The plaintiff also filed an affidavit in support of the motion, which asserted that the Behavioral Health Division "has refused to give any identity information on CNA Nikki" and asserted that Milwaukee County is "fully aware of the claim."[13] Dkt. No. 36.

In its January 26, 2023 order denying the plaintiff's motions for entry of default and default judgment, the court explained that the Behavioral Health Division had "returned the unexecuted waiver because it was unable to locate a 'Nikki' and needed additional information." Dkt. No. 43 at 1. The court explained that it "ha[d] no additional information regarding Nikki, the plaintiff ha[d] provided no additional identifying information and Nikki ha[d] not been served." Id. In denying the plaintiff's motion for default judgment, the court explained:

> The court cannot enter default under Federal Rule of Civil Procedure 55 or grant a default judgment under Federal Rule of Civil Procedure 56 against a defendant who never has been properly served under Federal Rule of Civil Procedure 4(c). Without proper service or an executed waiver of service, the court does not have personal jurisdiction over the defendant identified as "CNA Nikki." Silva v. City of Madison, 69 F.3d 1368, 1376 (7th Cir. 1995). Actual notice is insufficient to satisfy Rule 4's requirements. McMasters v. United States, 260 F.3d 814, 817 (7th Cir. 2001) (citing Mid–Continent Wood Prod., Inc. v. Harris, 936 F.2d 297, 301–02 (7th Cir. 1991)).

_____

[13] Like her motion for default judgment, the plaintiff's affidavit averred that "Judge Pepper has given written statement that the US Marshals performed all due diligence to summon CNA Nikki." Dkt. No. 36. The court does not know what "written statement" the plaintiff was referencing. The court consistently has explained that the Marshals Service needed additional information to serve "CNA Nikki." This includes an order dated November 7, 2022, where the court stated, "The U.S. Marshals service served [the defendant] but could not locate 'CNA Nikki' without additional information." Dkt. No. 25 at 1.

48

Id.at 2. Since the court issued this order, the plaintiff has not provided the court with any additional identifying information for "CNA Nikki" or filed a certificate of service.

  B. <u>Legal Standard</u>

  Federal Rule of Civil Procedure 4(m) provides that "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time." The court must extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to timely serve. Fed. R. Civ. P. 4(m). While Rule 4(m) generally requires the court to give notice to the plaintiff before dismissing a case on its own, "the purpose of such notice is to give the plaintiff an opportunity to show good cause for the failure." <u>See</u> <u>Dace v. Smith-Vasquez</u>, 658 F. Supp. 2d 865, 872 (S.D. Ill. 2009). Under certain circumstances, courts have dismissed without additional notice where "notice pursuant to Rule 4(m) would serve no useful purpose." <u>See</u> <u>id.</u> (dismissing portions of a complaint under Rule 4(m), despite not providing notice to the plaintiff, after Marshals Service twice attempted service on a defendant only described as "John Doe" but failed because of inadequate identification and the plaintiff "failed to take any action or request any assistance to ensure service of process").

  Rule 4(m)'s time limit "is tolled, in cases in which the plaintiff relies on the United States Marshals Service to effectuate service, until the date on which in forma pauperis status is granted." <u>Donald v. Cook Cnty. Sheriff's</u>

Dep't, 95 F.3d 548, 558 n.5 (7th Cir. 1996) (citing Paulk v. Dep't of the Air Force, 830 F.2d 79, 82-83 (7th Cir. 1987)). When a district court instructs the Marshals Service to effectuate service on behalf of a plaintiff, the plaintiff "need furnish no more than the information necessary to identify the defendant." Sellers v. United States, 902 F.2d 598, 602 (7th Cir. 1990) (indicating that the Marshals Service need sufficient information to identify a defendant and that designations like "John Doe No. 23" are insufficient). While a plaintiff may rely on the Marshals Service to effectuate service, however, "ultimately it is *the plaintiff's responsibility to identify the defendants* and assure proper service in accordance with Fed. R. Civ. P. 4(c)(1)." Wilson v. DeTella, Case No. 97 CV 7833, 1999 WL 160260, at *2 (N.D. Ill. Mar. 9, 1999) (emphasis added).

    C.   <u>Analysis</u>

Rule 4(m) says that if a plaintiff has not served a defendant within ninety days after the complaint was filed the court, "on motion *or on its own after notice to the plaintiff*," must dismiss the case without prejudice against the unserved defendant. The court never has given the plaintiff notice that it could dismiss "CNA Nikki" as a defendant if the plaintiff did not provide sufficient information to allow the Marshals Service to serve "CNA Nikki." When the court first received the Process Receipt and Return in February 2022, it should have issued an order advising the plaintiff that if she did not provide additional information to help identify "CNA Nikki" by a date certain, the court could dismiss "CNA Nikki" as a defendant. It did not do so. When the plaintiff filed her August 11, 2022 motion to strike (containing the allegation that "CNA

50

Nikki" already had defaulted), the court could have issued an order advising the plaintiff that if she didn't provide additional information to help identify "CNA Nikki" by a date certain, the court could dismiss "CNA Nikki." The court did not do so. In its January 26, 2023 order denying the plaintiff's motion for entry of default and motion for default judgment, the court should have advised the plaintiff that if she did not provide additional information to help identify "CNA Nikki" by a date certain, the court would dismiss "CNA Nikki" as a defendant. The court didn't do so.

Arguably the plaintiff has had plenty of time to provide the court with additional information to help identify "CNA Nikki." The plaintiff said in her motion for default judgment that she had asked the Behavioral Health Division multiple times to help her identify "CNA Nikki" and that they had refused. But the *plaintiff* has information about "CNA Nikki" that she did not provide. Was "CNA Nikki" female or male? What was "CNA Nikki's" skin tone? What was "CNA Nikki's" approximate age? Was "CNA Nikki" tall, short, skinny, heavier? What color was "CNA Nikki's" hair? Does the plaintiff know what part of the Behavioral Health Division she was in when she encountered "CNA Nikki"? The plaintiff could have provided any of this information to the court in the fourteen months since the court denied her motion for default judgment. She has not done so.

The court erred in failing to make clear to the plaintiff that: (a) the fact that the Behavioral Health Division knows about the lawsuit is not sufficient to constitute "service" on "CNA Nikki," (b) it is not the Marshals Service's

51

responsibility to conduct an investigation to figure out who "CNA Nikki" is or where he/she can be served, (c) it is the plaintiff's responsibility to provide sufficient information to allow the Marshals Service to serve the defendants and (d) if the plaintiff does not provide that information, the court may—on its own—dismiss "CNA Nikki" as a defendant. The court is making those things clear now. The court will require the plaintiff to file a written document telling the court why it should not dismiss "CNA Nikki" for the plaintiff's failure to provide sufficient information to allow the Marshals Service to serve "CNA Nikki." If the court does not receive the written document by the end of the day on **April 26, 2024**, the court will dismiss "CNA Nikki," and this case, without further notice or hearing. If the court receives the written document from the plaintiff by the end of the day on April 26, 2024, it will review it to determine whether the plaintiff has sufficiently stated a reason why the court should not dismiss "CNA Nikki."

## VII.   Conclusion

The court **GRANTS** the plaintiff's motion for additional evidence. Dkt. No. 38.

The court **DENIES** the plaintiff's motion to appoint counsel. Dkt. No. 44.

The court **DENIES** the plaintiff's motion for leave to file an amended complaint. Dkt. No. 45.

The court **GRANTS** the defendant's motion for summary judgment. Dkt. No. 28.

The court **ORDERS** that the case against defendant Jennifer Nichols is **DISMISSED WITH PREJUDICE**.

The court **ORDERS** that by the end of the day on **April 26, 2024**, the plaintiff must provide the court with a written document explaining why the court should not dismiss "CNA Nikki," and this case, for the plaintiff's failure to provide sufficient information to allow the Marshals Service to serve "CNA Nikki." The court **ORDERS** that the plaintiff must file this written document in time for the court to *receive* it by the end of the day on April 26, 2024. If the court does not receive the written document by the end of the day on April 26, 2024, the court will dismiss "CNA Nikki," and this case, without further notice or hearing.

Dated in Milwaukee, Wisconsin this 2nd day of April, 2024.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**